UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
RYAN SINGH,

                 Plaintiff,                          Index No.:

        -against-

THE CITY OF NEW YORK, OFFICER              **VERIFIED**
JORDAN BISTANY (NYPD) SHIELD #22702,    **COMPLAINT**
OFFICER "MINUTOLO" (NYPD), OFFICER
IOANNIS MANTAS (NYPD) SHIELD #25592, OFFICER   **JURY TRIAL**
DANIEL PATTI (NYPD) SHIELD #15686, OFFICER   **DEMANDED**
JOHN PETRUCCI (NYPD) SHIELD#
11301, and OFFICER(S) JOHN DOE #1-10 (THE
NAME(S) JOHN DOE BEING FICTICIOUS, AS THE
TRUE NAME(S) IS/ARE PRESENTLY UNKNOWN),

                 Defendants.
-------------------------------------------------------------------X

      The Plaintiff, complaining by his attorney(s), THE LAW OFFICE OF ANDREW L.

HOFFMAN, P.C., respectfully shows to this Court and alleges:

## INTRODUCTION

1. This is an action to vindicate the rights of Ryan Singh, a U.S. citizen of Indian-Guyanese

   descent, who was falsely arrested for drunk driving after an officer with a well-known

   history of racial animus and related misconduct happened upon his disabled vehicle.

2. In fact, Mr. Singh, whose car had simply blown a tire, had just left work and had not had

   anything to drink—he was merely standing outside of his inoperable vehicle, calling for a

   family member to render assistance.

3. Notwithstanding, the officer, Jordan Bistany, was rude, dismissive, and bullying—

   demanding that Mr. Singh put his "fucking phone" away, repeatedly asking "how much"

1

Mr. Singh had to drink, and insisting that he take a breathalyzer test; Mr. Singh complied, and the test gave no indication of alcohol consumption.

4. Undeterred, Bistany contacted some colleagues via cell phone (not police radio) who responded to the scene and took Mr. Singh into custody.

5. Mr. Singh, who had no prior criminal or arrest record, was then transported to the 112th precinct where he was asked to take an additional breathalyzer test.

6. This time, Mr. Singh refused—as it was obvious that the officers' agenda was something other than good faith law enforcement, and he had every reason to distrust them and their methods.

7. A videotaped interview with Mr. Singh was done, which included Singh lucidly answering questions and otherwise demonstrating his sobriety by completing various physical tasks and counting an array of numbers in sequence.

8. Even so, Mr. Singh was prosecuted all the way to trial—where he was acquitted of all charges.

9. The individual Defendants in this case are now being sued for their respective roles in fabricating evidence and bringing false charges against Mr. Singh in violation of his constitutional rights.

10. The City of New York is being sued for the deliberate indifference of the NYPD and Queens County District Attorney's Office to the well-known, longstanding misconduct of Bistany and the NYPD Highway Patrol Unit, which has included overt racial animus, and multiple detailed allegations of fabricating evidence, misuse of overtime, and quota-driven policing.

**THE PARTIES**

11. At all times relevant, Plaintiff RYAN SINGH, a U.S. citizen of Indian-Guyanese descent who was 21-years-old on the date of the incident, resided in Brooklyn, NY.

12. Upon information and belief, at all times relevant, the Defendant, CITY OF NEW YORK was and still is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York, and that at all times relevant all Defendant officers were acting for, upon, and in furtherance of the business of their employer and within the scope of their employment.

13. Upon information and belief, at all times relevant, the Defendant, CITY OF NEW YORK, its agents, servants, and employees, operated, maintained and controlled the New York City Police Department, including all the police officers thereof.

14. Upon information and belief, at all times relevant, the Defendant, CITY OF NEW YORK, its agents, servants, and employees, operated, maintained and controlled the policies of the City of New York's "constituent counties," including the Queens County District Attorney's Office because in making decisions other than whether to prosecute, the district attorney acts as the manager of the district attorney's office, which is a municipal function, making the City the proper defendant for the policies alleged herein.

15. Upon information and belief, at all times hereinafter mentioned, Defendant officers JORDAN BISTANY, "MINUTOLO," IOANNIS MANTAS, DANIEL PATTI, JOHN PETRUCCI, and POLICE OFFICER(S) DOE #1-10[1] were employed by the Defendant CITY OF NEW YORK, as members of its police department.

---

[1] Plaintiff's diligent search for the identity of all Defendants involved remains ongoing. Accordingly, the Corporation Counsel is on notice that the plaintiff intends to name every party involved as a defendant once their

3

16. More specifically, upon information and belief, BISTANY, "MINUTOLO," MANTAS, and PETRUCCI were assigned to NYPD Highway Unit No. 3, and PATTI was assigned to the 112th precinct, in Queens, New York.

17. The New York City Police Department is a local governmental agency, duly formed and operating under and by virtue of the Laws and Constitution of the State of New York and the police chief of the New York City Police Department is responsible for the policies, practices, and customs of the New York City Police Department as well as the hiring, screening, training, supervising, controlling and disciplining of its police officers and civilian employees, and is the final decision maker for that agency.

18. The Queens County District Attorney's Office is a local governmental agency, duly formed and operating under and by virtue of the Laws and Constitution of the State of New York and the District Attorney is responsible for the policies, practices, and customs of the Queens County District Attorney's Office as well as the hiring, screening, training, supervising, controlling and disciplining of its assistant district attorneys and civilian employees, and is the final decision maker for that agency.

19. This action arises under the United States Constitution, particularly under provisions of the Fourth and Fourteenth Amendments of the Constitution of the United States, and under federal law, particularly the Civil Rights Act, Title 42 of the United States Code, Section 1983, the rights guaranteed by the Constitution, and the laws of the State of New York.

20. Individual Defendants in this action are being sued in both their individual and official capacities.

---

identities are revealed through discovery.  All appropriate steps to prepare their defenses and otherwise inform them that they will be individually named should be undertaken forthwith.

## STATEMENT OF FACTS

### -Ryan Singh's Story--

21. On June 16, 2017, at approximately 1:45AM near the intersection on Van Wyck Expressway and Jewel Avenue in Queens, NY, Plaintiff Ryan Singh, age 21, was driving home from work when his tire blew.

22. Thankfully, Mr. Singh was able to get the car to the median safely, despite his left front tire becoming detached, and the remaining rim being cracked.

23. Once his car was secure at the median, Mr. Singh exited the vehicle and called his sister for assistance.

24. Shortly thereafter, while Singh was on the phone, a police car pulled up behind his vehicle; Defendants Bistany and his partner "Minutolo" were inside.

25. Although the officers' car was equipped with a dashboard camera, in contravention of ordinary procedure, the officers declined to activate it.

26. Bistany exited the vehicle first and approached Mr. Singh in an aggressive and bullying manner, demanding that Mr. Singh get off his "fucking phone."

27. Joined by "Minutolo," the officers hounded Mr. Singh, demanding to know "how much" he had been drinking, impervious to Mr. Singh's repeated denials of having had anything to drink.

28. Mr. Singh tried to explain what was visually obvious—he had simply blown a tire and was calling for assistance—but Bistany would have none of it.

29. Bistany insisted that Singh take a breathalyzer test; Mr. Singh complied, and the test gave no indication of alcohol consumption.

30. Undeterred, Bistany contacted either Defendant officer Mantas or Petrucci via cell phone,[2] and summoned them to the scene.

31. Once there, Mantas, who would become the arresting officer, picked up where Bistany had left off—aggressively demanding to know "how much" Mr. Singh had been drinking, despite his repeated denials of having had anything to drink.

32. After several minutes, Mantas lost patience and handcuffed Mr. Singh, absent probable cause, before he and Petrucci transported him to the 112th precinct for processing.

33. Bistany, "Minutolo," and Petrucci were all present for this, but none made any effort to intervene.

34. It was now obvious that the Defendant officers were determined to falsely charge Mr. Singh with drunk driving, and had no problem violating the law in service of that corrupt agenda; accordingly, when Defendants Patti and Mantas asked Singh to take a second breathalyzer test at the precinct, he refused.

35. This led to an interview by Mantas which was videotaped by Petrucci, in which Mr. Singh was asked a series of questions, all of which were premised on the false notion that Mr. Singh had been drinking.

36. Notably, Mr. Singh answered the questions clearly, succinctly, and in a manner completely inconsistent with being intoxicated.

37. Mr. Singh was also asked to endure a "Gaze Nystagmus" test, shoddily and improperly performed by Defendant Patti—a test which involves the tracking a pen an officer is

---

[2] Mantas and Petrucci were working together in the same car on the night of the incident.  At trial, Minutolo claimed that Bistany called Mantas; however, Mantas testified that Bistany spoke to his partner Petrucci.  The prosecution declined to call Bistany or Petrucci to testify at trial, so who spoke to whom, and the content of the conversation, was not made part of the record or subject to cross-examination.

holding to check for any "bouncing of the eyes" which may be consistent with intoxication.

38. Patti's improperly performed "test" likewise yielded no evidence of drunkenness.

39. Mr. Singh was also asked to perform a series of physical tests, such as walking in a straight line and repeating numbers in various sequences—all of which Petrucci videotaped, and all of which Singh accomplished without difficulty.

40. Notwithstanding, Mr. Singh was processed through Central Booking, and detained for approximately 24 hours before seeing a judge and being released on his own recognizance.

41. Mr. Singh was charged with VTL 1192-1 Operating a Motor Vehicle While Under the Influence of Alcohol or Drugs, a violation, and 1192-3 Operating a Motor Vehicle While Under the Influence of Alcohol, a misdemeanor.

42. Thereafter, Mr. Singh was forced to make approximately 10 additional court appearances and endure a hearing and trial before a jury recognized and rejected the officers' false allegations and acquitted him of all charges.


**-Mantas's Story-**

43. Defendant Mantas, Singh's arresting officer, manufactured the basis for Mr. Singh's arrest with a laundry list of fabricated boilerplate drunk driving indicators.

44. For example, Mantas claimed that when he arrived at the scene, Bistany told him that he had come upon Singh sitting in the driver's seat of his (inoperable) car with the keys in the ignition and engine running.

45. Mantas also claimed that Singh had "bloodshot, watery eyes," and was "unsteady on his feet."

46. These fabricated boilerplate claims were undermined by the suspicious absence of any dashcam video, and especially video of Singh at the precinct which shows he was lucid, clear-eyed, and able to walk without difficulty.

47. Mantas also falsely stated that his impetus for taking Singh into custody was that Singh admitted at the scene that he had been drinking with some friends.

48. Yet oddly, Mantas did not record this highly material alleged admission in is memo book or *any other* portion of his paperwork, before finally slipping it into the criminal complaint, which was drafted some 9.5 hours *after* Singh's arrest.

49. Moreover, "Minutolo," who was present with Mantas at the scene, couldn't corroborate any portion of the alleged admission by Singh at trial—and the other officers present, Bistany and Petrucci, were never called by the prosecution to testify.

50. It was likewise telling that during Mantas's videotaped interview with Singh at the precinct, Singh repeatedly denied having anything to drink—and Mantas made no effort to follow-up by asking in sum and substance, "Wait a minute. Didn't you just tell me you had been drinking with some friends?"

51. Finally, Mantas alleged that Bistany told him Singh blew a .17 in a breathalyzer at the scene, a claim once again undermined by the absence of any dashcam video, not to mention any digital, printed, or photographic evidence of such a result.

52. It is likewise undermined by the prosecution's decision not to call Bistany to testify, the absence of any corroborative evidence from other officers at the scene who would have witnessed such a result, Mantas's testimony that his impetus for arresting Singh was

Singh's alleged admission to drinking with friends (as opposed to a .17 breathalyzer result), and especially the absence of any mention of the alleged .17 in Mantas's criminal complaint or memo book.

53. Indeed, the only evidence that Singh had blown a .17 on a breathalyzer was the uncorroborated word of Bistany—who remains employed by the NYPD to this day, despite his widely-known racist views and credibility problems within the department, the Queens County District Attorney's Office, and judges within the Queens County Criminal Court.

**-Racism and Misconduct by Bistany and the Highway Patrol Unit-**

54. The class action suit, McLennon v. City of New York,[3] which cost New York taxpayers some $670,000.00 in settlement and attorney's fees, provides disturbing context for the instant suit, given its details of racial animus and corruption emanating from Bistany and the NYPD Highway Patrol Unit.

55. In McLennon, Plaintiffs alleged that Unit leadership has "created and perpetuated an environment that [was] not only discriminatory and hostile to minorities within the Unit but also in the creation and execution of a policy, practice, and/or custom that permits[ed] racial and ethnic profiling of drivers on the City's roadways." McLennon, DCKT. 95, ¶133.

56. The McLennon Plaintiffs specified that "Bistany was the arresting officer in 10% of the unconstitutional stops by Highway Patrol Unit 3 between 2011 and 2016," and "ha[d] been publicly hostile toward minorities." McLennon, DCKT. 95, ¶135.

---

[3] Second Amended Class Action Complaint, 14-CV-06320 (EDNY) (DCKT. 95), incorporated here by reference.

57. The McLennon Plaintiffs further specified that in a collection of reported judicial decisions beginning in June 2012, New York criminal court judges found that the Highway Patrol Unit had engaged in a series of unconstitutional stops, and "found incredible the testimony of different Highway Patrol officers regarding their purported justification" for the stops.  McLennon, DCKT. 95, ¶¶9-11.

58. The decisions were personally served on the NYPD Headquarters at One Police Plaza and the NYPD Highway Patrol Unit 3 on August 16, 2012, providing the department with actual notice of the unconstitutional stops, and the pattern of dishonest officer testimony aimed at justifying them.  McLennon, DCKT. 95, ¶¶14-15.

59. Nonetheless, despite having actual notice of the decisions, the unlawful policy, practice, and/or custom of unconstitutional and disproportionate stops of minorities was allowed to continue.  McLennon, DCKT. 95, ¶¶5, 15.

60. For example, in November of 2014, Bistany pulled over and arrested a Hispanic man named Alberto Rodriguez who was driving with an African American passenger; Bistany alleged that Rodriguez had been driving while high.  See profile of Bistany and his misdeeds in Gothamist, Judge Orders Prosecutors to Disclose Cop's Anti-Black Lives Matter Facebook Posts, 4/24/2017, available at https://gothamist.com/news/judge-orders-prosecutors-to-disclose-cops-anti-black-lives-matter-facebook-posts.

61. At Rodriguez's April 2017 trial, Bistany testified that his basis for the stop was that Rodriguez had moved from the right lane to the center lane four times—though as with the present case, Bistany elected not to turn on his dashcam to capture the alleged conduct; nor could Bistany articulate any violation of traffic law to establish probable cause for the stop.

10

62. Through the course of the trial, it was also revealed that, "[o]n his publicly accessible Facebook page, Officer Bistany heralded the individual who drove his car through a crowd of Black Lives Matter protesters in Ferguson, Missouri, referring to him as a 'hero.'" McLennon, DCKT. 95, ¶136; *Gothamist*, Judge Orders Prosecutors to Disclose Cop's Anti-Black Lives Matter Facebook Posts, 4/24/2017, available at https://gothamist.com/news/judge-orders-prosecutors-to-disclose-cops-anti-black-lives-matter-facebook-posts.

63. It was likewise revealed that Bistany had "represented repeatedly that he would arbitrarily enforce the law based on race including, but not limited to, that he would enact a 'slowdown in arrests' because of Mayor Bill  de Blasio's relationship with 'the black mambazo,' referring to the Reverend All Sharpton." McLennon, DCKT. 95, ¶137; *Gothamist*, Judge Orders Prosecutors to Disclose Cop's Anti-Black Lives Matter Facebook Posts, 4/24/2017, available at https://gothamist.com/news/judge-orders-prosecutors-to-disclose-cops-anti-black-lives-matter-facebook-posts.

64. Rodriguez was subsequently acquitted of the "driving while high" charge.

65. Following the revelations of Bistany's Facebook posts, Rodriguez's trial judge, Judge John Latella, directed the prosecutor, Michael Brovner, to circulate Bistany's Facebook posts throughout the Queens District Attorney's Office and disclose them to any defense attorneys working on other cases involving Bistany. Id.

66. Notably, in addition to the damning April 2017 *Gothamist* profile, Bistany has been the subject of at least four CCRB investigations, and at least three police misconduct suits filed between 2007 and 2014.

67. At a February 8, 2018 hearing for Mr. Singh's case, Judge John F. Zoll acknowledged twice on the record that he was "aware of Officer Bistany's past."

68. Yet upon information and belief, Bistany has never been subject to any investigation, retraining, or disciplinary action for his racist public Facebook posts or other misconduct; to the contrary, just a month after Judge Zoll's remarks, the NYPD backed Bistany's selection as part of an elite group of officers certified as "Drug Recognition Experts," which favorably recognized him as "being proactive within [his] community and be well-versed in DWI detection."  See *3/22/18 Press Release,* available at https://dmv.ny.gov/press-release/press-release-03-22-2018.

69. Thus, at the time of Mr. Singh's arrest in June of 2017, it is clear that the problems of Bistany and the Highway Patrol Unit were widely known within the NYPD, the Queens County District Attorney's Office, and judges within the Queens County Criminal Court; notwithstanding, both the NYPD and Queens County District Attorney's Office continued to hold Bistany in good standing, utilizing strategic workarounds to avoid attaching his name to arrest paperwork or otherwise testifying as a witness where his misdeeds would be revealed through cross examination.[4]

70. Notably, the ease with which Bistany made his racist remarks on Facebook was not a mere coincidence, as at all times relevant, racial animus in the Highway Patrol Unit was commonplace.

71. The McLennon Plaintiffs emphasized that "[s]upervisors within the Highway Patrol Unit not only sanction [the] discriminatory actions of Caucasian officers but partake in the hostility directed specifically at minorities within the Unit.  McLennon, DCKT. 95, ¶139.

---

[4] It is notable that Bistany chose to call on Mantas to arrest Mr. Singh in the instant case, and that the Queens County District Attorney's Office never called Bistany to testify at Singh's trial.

72. For example, NYPD Officer Dana Harge and Sergeant Andre Sce both filed federal employment discrimination suits in 2016, describing rampant racism within the Highway Patrol Unit, which included "minority officers [being] subjected to racial epithets and discriminatory treatment" over a period of years, that was "ignored and implicitly, if not explicitly encouraged" by the Unit's highest ranking members.  <u>McLennon</u>, DCKT. 95, ¶139-144; <u>Harge v. City of New York</u>, No. 16-cv-5160 (S.D.N.Y.); <u>Sce v. City of New York</u>, No. 16-cv-7577 (S.D.N.Y.).

73. Relatedly, in 2017, Sergeant Valentin Khazin, a colleague of Officer Harge, filed a federal lawsuit alleging that supervisors within the Highway Patrol Unit retaliated against him for refusing to partake in the continuing discrimination and retaliation against Officer Harge.  <u>McLennon</u>, DCKT. 95, ¶145; <u>Khazin v. City of New York</u>, No. 17-cv-3779 (E.D.N.Y.).

74. Clearly, none of the above-cited wrongdoing was followed by any meaningful attempt on the part of the municipality to investigate or forestall the Unit's racist culture and related misconduct.

75. Instead, despite having actual or constructive notice of it, New York City Police Chief James P. O'Neill and Queens County District Attorney Richard Brown, or their designees, either turned a blind eye or actively rewarded[5] the conduct.

76. The decisions by New York City Police Chief James P. O'Neill and Queens County District Attorney Richard Brown, or their designees, to continue working with Bistany and/or utilizing strategic workarounds to conceal or downplay his participation in cases was especially egregious.

---

[5] <u>See</u> ¶68, <u>supra</u>.

77. The deficits in Bistany's character and their likelihood to result in civil rights violations should have been readily apparent well before Mr. Singh's June 16, 2017 arrest—certainly no later than May of 2015 when Bistany's conduct was described in McLennon's First Amended Complaint—and especially by April of 2017 when the *Gothamist* profile was published and Judge Latella ordered the District Attorney's office to disclose Bistany's Facebook posts to defendants in Bistany's other cases.

78. This policy of inaction existed, despite the obvious need for enhanced training and supervision of Bistany, the Highway Patrol Unit, and Queens County prosecutors to protect against future constitutional violations.

79. Accordingly, there can be no doubt that policy makers at the highest levels of the NYPD and Queens County District Attorney's Office repeatedly condoned, rewarded, and otherwise ratified the policy, practice, and/or custom permitting racial and ethnic profiling and the fabrication of evidence against drivers on New York City roadways—conduct which had repeatedly been adjudicated to be in violation of defendants' civil rights.

80. There can likewise be no doubt that the policy makers action or inaction described herein was causally linked and a "moving force" behind the constitutional violations suffered by Ryan Singh.

**-The Highway Patrol Unit's Use of Overtime Pay to Incentivize Compliance with Illegal Quotas-**

81. During the period relevant to the instant case, the NYPD Highway Patrol Unit required officers in Highway Patrol Units 2 and 3 to issue a minimum of 70 summonses per

month. <u>Harge v. City of New York</u>, No. 16-cv-5160 (S.D.N.Y.), ¶¶ 75–77, 132; <u>Khazin v. City of New York</u>, 17-cv-3779 (E.D.N.Y.), ¶ 21.

82. The McLennon Plaintiffs specifically alleged the use of quotas "for the numbers of summonses issued and arrests made." <u>McLennon</u>, DCKT. 95, ¶148.

83. In addition to being illegal, the numbers set for the quotas were unreasonably high.

84. Nevertheless, the quotas were strictly enforced and when officers did not make them, they ran into problems on the job.  <u>Harge v. City of New York</u>, No. 16-cv-5160 (S.D.N.Y.) (DCKT. 50), ¶ 75.

85. One of the most significant of these "problems" at the Highway Patrol Unit during this period was the denial of overtime pay.

86. The potential loss of overtime pay was a substantial threat, as overtime was "such a staple of the employment of an officer with the police department that on the NYPD website they calculate[d] the total salary for a new officer to be base pay plus their overtime pay." <u>Khazin v. City of New York</u>, 17-cv-3779 (E.D.N.Y.) (DCKT.55), ¶ 51.

87. In effect, overtime was used as a kind of bonus for making one's quota, and a punishment for failing to make it.

88. Thus, officers were perversely incentivized to make unjustified stops, issue unjustified summonses, and make unjustified arrests in order to make their numbers, collect their "bonus" pay, and avoid salary deductions.

89. The unjustified stops, arrests, and summonses were disproportionately aimed at people of color.

90. Upon information and belief, during the relevant period, Officer Bistany ranked in the 97th percentile for the number of overtime hours worked by a Queens police officer,

while Mantas ranked in the 96th percentile, amplifying that their conduct was not just tolerated, but rewarded.

91. The NYPD's use of illegal quotas during the period relevant to this litigation (and well beyond) has been heavily litigated and widely reported.[6]

92. Nevertheless, despite having actual or constructive notice of their use, New York City Police Chief James P. O'Neill and Queens County District Attorney Richard Brown, or their designees, either turned a blind eye or actively rewarded such conduct.

93. This policy of inaction existed, despite the obvious need for enhanced training and supervision regarding the use of quotas and their related hazards, and the intended purpose of overtime pay.

94. Accordingly, there can be no doubt that policy makers at the highest levels of the NYPD and Queens County District Attorney's Office condoned, rewarded, or otherwise ratified the policy, practice, and/or custom permitting illegal quotas and the improper use of overtime pay to incentivize it.

95. There can likewise be no doubt that the policy makers action or inaction described herein was causally linked and a "moving force" behind the constitutional violations suffered by Ryan Singh.

### AS AND FOR THE FIRST CAUSE OF ACTION
### ON BEHALF OF THE PLAINTIFF AGAINST
### DEFENDANTS BISTANY, "MINUTULO," PETRUCCI AND MANTAS

---

[6] See e.g., Floyd v. City of New York, 08-CV-1034 (S.D.N.Y.), the landmark "stop and frisk" case replete with references to secret recordings that detailed lieutenants' directives to officers to "get those numbers" and which led to the appointment of an N.Y.P.D. monitor; Schoolcraft v. City of New York, 10-cv-6005 (S.D.N.Y.), an officer retaliation case alleging illegal NYPD quotas and the manipulation of crime reports which settled for $600,000; Mathews v. City of New York, 12-CV-1354 (S.D.N.Y.), an officer retaliation case where Matthews accused the city of retaliating against him for speaking out against quotas, which settled for $280,000; Stinson, et al. v. City of New York, et al., 10-CV-4228 (S.D.N.Y.), which resulted in a $75 million settlement in 2017; Raymond, et al., v. City of New York, et al, 15-CV-6885 (S.D.N.Y.), a pending class action/officer retaliation case recently featured in a Hulu documentary called Crime & Punishment.  Each of these cases was widely covered in the press.

**Violation of Constitutional Rights Under Color of State Law**
**-False Arrest/Imprisonment-**

96. Plaintiff incorporates by reference and realleges each and every allegation stated in Paragraphs 1 through 95.

97. The Fourth Amendment of the United States Constitution protects citizens from unreasonable searches and seizures by government officials and prohibits law enforcement officers from arresting and detaining individuals in the absence of appropriate authorization.  It also precludes police officers from conducting arrests in the absence of probable cause to believe that a crime has been committed.

98. The actions of the Defendants as stated herein violated Ryan Singh's rights under Federal law.

99. As set forth herein, it is clear that the Defendants lacked any objectively reasonable basis to support a legitimate probable cause arrest, as the basis for Mr. Singh's arrest was fabricated.

100.      Defendants' actions were motivated by bad faith, malice, and/or deliberate indifference to the rights Ryan Singh.

101.      This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken by New York City police officers under color of state law.

102.      As a direct and proximate result of the unconscionable acts described above, Plaintiff Ryan Singh has been substantially injured.

**AS AND FOR THE SECOND CAUSE OF ACTION**
**ON BEHALF OF THE PLAINTIFF AGAINST**
**DEFENDANTS BISTANY, "MINUTULO," PETRUCCI, MANTAS, AND PATTI**

**Violation of Constitutional Rights Under Color of State Law**
**-Malicious Prosecution-**

103.    Plaintiff incorporates by reference and realleges each and every allegation stated

in Paragraphs 1 through 102.

104.    The Fourth Amendment of the United States Constitution protects citizens from

malicious prosecution by government officials without probable cause.

105.    Ryan Singh was prosecuted, without probable cause, relative to false evidence

generated and/or endorsed by the Defendants.

106.    The false and malicious charges resulted in a loss of liberty for Mr. Singh, as he

was incarcerated and forced to fight said charges at trial, incurring substantial costs as a

direct result.

107.    The case against Mr. Singh was unambiguously terminated in his favor.

108.    Defendants' actions were motivated by bad faith, malice, and/or deliberate

indifference to the rights of Mr. Singh.

109.    This conduct on the part of Defendants also represents a violation of 42 U.S.C. §

1983, given that said actions were undertaken under color of state law.

110.    As a direct and proximate result of the unconstitutional acts described above,

Plaintiff Ryan Singh has been substantially injured.


**AS AND FOR THE THIRD CAUSE OF ACTION**
**ON BEHALF OF PLAINTIFF AGAINST AGAINST**
**DEFENDANTS BISTANY, "MINUTULO," PETRUCCI, MANTAS, AND PATTI**

**Violation of Constitutional Rights Under Color of State Law**
**-Denial of Constitutional Right to Fair Trial Due to Fabrication of Evidence-**

111. Plaintiff incorporates by reference and realleges each and every allegation stated in Paragraphs 1 through 110.

112. Defendant police officers created and/or ratified false evidence that the Plaintiff had been driving while intoxicated, as herein described.

113. Defendant officers forwarded said false and material evidence and false information to prosecutors in the Queens County District Attorney's office.

114. Defendants misled the judge and the prosecutors by creating and/or ratifying false evidence against the Plaintiff.

115. In creating and/or ratifying false evidence against Plaintiff, in forwarding false evidence and information to prosecutors, Defendants violated Plaintiff's constitutional right to a fair trial under the Due Process Clause of the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

116. This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

117. As a direct and proximate result of the unconstitutional acts described above, Plaintiff Ryan Singh has been substantially injured.

<u>**AS AND FOR THE FOURTH CAUSE OF ACTION**</u>
<u>**ON BEHALF OF THE PLAINTIFF AGAINST**</u>
<u>**DEFENDANTS BISTANY, "MINUTULO," PETRUCCI, MANTAS, AND PATTI**</u>

**Violation of Constitutional Rights Under Color of State Law**
**-Conspiracy to Violate Plaintiffs' Civil Rights-**

118.      Plaintiffs incorporate by reference and reallege each and every allegation stated in Paragraphs 1 through 117.

119.     Defendant police officers, as state actors in their individual capacities pursuing personal interests wholly separate and apart from that of the City of New York or New York City Police Department, conspired together, as set forth herein, reached a mutual understanding, and overtly acted in concert to undertake a course of conduct violative of the Plaintiff's constitutional rights by:

   a.   Agreeing to fabricate evidence, falsely arrest and maliciously prosecute the Plaintiff, as set forth herein.

120.     This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

121.     Defendants' actions were motivated by bad faith, malice, and/or willful indifference to the Plaintiff's rights.

122.     As a direct and proximate result of the unconstitutional acts described above, Plaintiff Ryan Singh has been substantially injured.

**AS AND FOR THE FIFTH CAUSE OF ACTION
ON BEHALF OF THE PLAINTIFF AGAINST
DEFENDANTS BISTANY, "MINUTULO," PETRUCCI, MANTAS, AND PATTI**

**Violation of Constitutional Rights Under Color of State Law
-Failure to Intercede-**

123.     Plaintiff incorporates by reference and realleges each and every allegation stated in Paragraphs 1 through 122.

124.     The Fourth Amendment of the United States Constitution protects citizens from unreasonable searches and seizures by government officials without the appropriate authorization.

125.     The actions of Defendant officers detailed above violated the Plaintiff's rights under the United States Constitution.  It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.

126.     Defendants' actions were motivated by bad faith and malice, and/or deliberate indifference to the rights of the Plaintiff.

127.     This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

128.     As a direct and proximate result of the unconstitutional acts described above, Plaintiff Ryan Singh has been substantially injured.

**AS AND FOR THE SIXTH CAUSE OF ACTION
ON BEHALF OF THE PLAINTIFF AGAINST ALL NAMED DEFENDANTS**

**- Implementation of Municipal Policies, Practices, and Customs that Directly Violate Constitutional Rights, Failure to Implement Municipal Policies to Avoid Constitutional Deprivations and Failure to Train and Supervise Employees Under Color of State Law-**

129.     Plaintiff incorporates by reference and realleges each and every allegation stated in Paragraphs 1 through 128.

130.     Upon information and belief, Defendant City of New York, New York City Police Chief James P. O'Neill and Queens County District Attorney Richard Brown, or their designees, supervised, directed, and otherwise sanctioned the wrongful conduct of the Defendant officers as stated herein.

131.     Upon information and belief, Defendant City of New York, New York City Police Chief James P. O'Neill and Queens County District Attorney Richard Brown, or their designees, were supervisors and final decision makers, and as a matter of policy, practice,

and custom, have acted with a callous, reckless and deliberate indifference to the Plaintiff's constitutional rights and laws of the United States, in that they failed to adequately discipline, train, supervise or otherwise direct police officers concerning the rights of citizens, including not making false arrests, fabricating evidence, engaging in racial profiling, utilizing quotas, and improperly using overtime pay to incentivize compliance with quotas, as set forth herein.

132.    In the alternative, and upon information and belief, Defendants instituted policies addressing the topics listed above, and as set forth herein, but through deliberate indifference to the same culture of gross negligence, carelessness, and malice, demonstrated a willful indifference to the constitutional rights of the Plaintiff.

133.    The policies, procedures, customs and practices of the Defendants violated the Constitutional rights of the Plaintiff under the Fourth Amendment of the United States Constitution.

134.    It is widely recognized that all law enforcement officials have an affirmative duty only to arrest when there is probable cause to do so, to refrain from fabricating evidence, to refrain from racial profiling, to refrain from the use of arrest quotas, to refrain from utilizing overtime pay to incentivize compliance with arrest quotas, and to intervene to protect the clearly established constitutional rights of citizens from infringement by other law enforcement officers in their presence.

135.    At all times relevant herein, the right to be free from deprivations of liberty interests caused by unjustifiable criminal charges and procedures as set forth herein were clearly established constitutional rights that a reasonable person would have known.

136.     As set forth herein, over a span of years, the NYPD's Highway Patrol Unit has repeatedly been mentioned as a site for police misconduct.

137.     As set forth herein, the nature, regularity, and scale of such revelations about Bistany and the Highway Patrol Unit gives rise to an inference of systemic incompetence and corruption on the part of the New York City Police Department, as such a widespread legacy of injustices cannot plausibly be laid at the feet of a few rogue officers.

138.     Defendant(s) also, upon information and belief, demonstrated deliberate indifference to the rights of those arrested in the City of New York by failing to adequately hire, screen, train, and supervise officers in the Highway Patrol Unit.

139.     The policies, procedures, customs and practices of the above-referenced Defendants violated the Constitutional rights of the Plaintiff under the Fourth, and Fourteenth Amendments of the United States Constitution.

140.     This conduct on the part of Defendants also represents a violation of 42 U.S.C § 1983, given that said actions were undertaken under color of state law.

141.     Upon information and belief, none of the Defendants named herein were disciplined for their actions relative to the Plaintiff.

142.     As a direct and proximate result of the unconstitutional acts described above, Plaintiff Ryan Singh has been substantially injured.

## DEMAND FOR PUNITIVE DAMAGES

143.     The actions of Defendants described herein were extreme and outrageous and shock the conscience of a reasonable person.  Consequently, an award of punitive

damages is appropriate to punish the Defendants for their cruel and uncivilized conduct. The Plaintiffs do not seek punitive damages against the City of New York.

## DEMAND FOR TRIAL BY JURY

144.      The Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff Ryan Singh requests that this Honorable Court grant him the following relief:

A.  A judgment in favor of Plaintiff against all Defendants for compensatory damages in an amount to be determined by a properly charged jury.

B.  A judgment in favor of Plaintiff against all Defendants but the City of New York for punitive damages in an amount to be determined by a properly charged jury;

C.  A monetary award for attorneys fees and costs of this action, pursuant to 42 U.S.C. § 1988;

D.  Any other relief this Court finds to be just, proper, and equitable.


Dated:  New York, New York                    Respectfully Submitted By:
        June 10, 2020


                                    _____/s_____
                                    Andrew L. Hoffman, Esq. (AH9502)
                                    Law Office of Andrew L. Hoffman, P.C.
                                    *Attorneys for the Plaintiff*
                                    261 Madison Avenue, 12 Floor
                                    New York, NY 10016
                                    T: (212) 736-3935
                                    E: ahoffman@andrewhoffmanlaw.com

## **ATTORNEY'S VERIFICATION**

STATE OF NEW YORK )

                     SS.:

COUNTY OF NEW YORK)

I, the undersigned, am an attorney admitted to practice in the Courts of the State of New York, say that:

I am associated with the attorney of record for the Plaintiff, The Law Office of Andrew L. Hoffman, PC, 261 Madison Avenue, 12th FL, New York, New York 10016.

I have read the foregoing Verified Complaint and knows the contents thereof; that and the same is true to my knowledge, except as to the matters therein stated to be alleged on information and belief, and, as to those matters I believe them to be true.

My belief as to those matters therein not stated upon knowledge is based on investigation, correspondence, conferences and all facts, data, information, reports, statements, etc. in our file pertaining to this matter.

The reason I make this Affirmation instead of the Plaintiff is that the Plaintiff is not within the county where Affirmant maintains his office.

I affirm that the foregoing statements are true under penalties of perjury.

Dated:         New York, New York
                 June 10, 2020

                                 _____/s_____
                                     Andrew L. Hoffman, Esq.